# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
August 27, 2014 Session

## IN RE: GLORY A.W.

**Appeal from the Juvenile Court for Roane County**
**No. 2012-JC-222      Dennis Humphrey, Judge**

---

### No. E2013-02303-COA-R3-PT-FILED-OCTOBER 21, 2014

---

William L.W. ("Father") appeals the termination of his parental rights to the minor child Glory A.W. ("the Child"). We find and hold that the evidence does not preponderate against the Juvenile Court for Roane County's ("the Juvenile Court") finding by clear and convincing evidence that grounds were proven to terminate Father's parental rights for abandonment by failure to provide a suitable home pursuant to Tenn. Code Ann. § 36-1-113(g)(1) and § 36-1-102(1)(A)(ii); for substantial noncompliance with the permanency plan pursuant to Tenn. Code Ann. § 36-1-113(g)(2); and for persistent conditions pursuant to Tenn. Code Ann. § 36-1-113(g)(3). We further find and hold that the evidence does not preponderate against the Juvenile Court's finding by clear and convincing evidence that it was in the Child's best interest for Father's parental rights to be terminated. We affirm the Juvenile Court's February 19, 2014 order terminating Father's parental rights to the Child.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed
### Case Remanded

D. MICHAEL SWINEY, J., delivered the opinion of the Court, in which CHARLES D. SUSANO, JR., C.J., and JOHN W. MCCLARTY, J., joined.

Robert L. Vogel, Knoxville, Tennessee, for the appellant, William L.W.

Robert E. Cooper, Jr., Attorney General and Reporter; and Leslie Curry, Assistant Attorney General for the appellee, State of Tennessee Department of Children's Services.

# OPINION

## Background

The Child was taken into State custody on August 4, 2011 due to drug use by Father and the Child's mother, Megan A.H. ("Mother"), a volatile relationship between Father and Mother, and Father's admission of an extensive criminal history. The State of Tennessee Department of Children's Services ("DCS") filed a petition seeking to terminate the parental rights of Father and Mother[1] on July 12, 2012. The case was tried in September of 2013.

Jessica Howard, the team leader supervisor for DCS who supervised the Child's case, testified at trial. Ms. Howard testified about the steps that DCS took during the first four months that the Child was in State custody to assist Father in providing a suitable home for the Child. She testified:

> We worked with [Father] on referring him for a mental health assessment, an alcohol and drug assessment, domestic violence counseling, anger management counseling, parenting classes. We provided supervised visitation services that were contacted [sic] through Foothills, we paid for that.
>
> [Father] had health insurance. Had he not health - - had health insurance or he'd lost it, we were prepared to pay for all of those assessments and services.

When asked what efforts Father made, Ms. Howard stated:

[Father] did go complete a mental health assessment at Ridgeview. That was completed with Paul Taylor. Later learned that he wasn't completely truthful with that, as he later admitted to us that he has a past diagnosis of schizoaffective bipolar disorder and he was not - - wasn't completely honest with them with that. So I had asked him at that point in December to have another mental health assessment.

> But he did complete parenting classes through Child and Family of Tennessee, which we arranged for him. He completed that in August 27th. However, there were concerns with that because he did not display the

---

[1] Mother surrendered her rights to the Child prior to trial, and Mother is not involved in this appeal.

appropriate parenting skills learned in that when he was doing visits with [the Child].

Ms. Howard also testified that there was a short period of time that Father had an apartment before being evicted, and that Father also had a truck for a short period of time. She also testified that Father did complete a parenting class.

When Ms. Howard was asked what behaviors she observed during visitations between Father and the Child that concerned her, she stated:

There were times when I would step in, and [Father] would be forcibly feeding [the Child] to the point where [the Child's] checks [sic] were so full that he could hardly swallow or breathe. There was - - causing us concern for - - for choking hazards.

There was one incident where [Father] had some of those - - that you - - that have the holes in them and put them on [the Child's] fingers and [the Child] didn't like that. He wanted them off, and it was very upsetting to [the Child] to the point where, I don't know, it was like pretty tight fingers.

And there was also times when [Father] would kind of forcibly have [the Child] hug him to the point where he was screaming from, like, holding him down, and [the Child] - - you could tell that [the Child] did not like that.

Ms. Howard testified that at one point the Child was doing a trial home visit with Mother, and the visit was disrupted due to Father's behavior. Ms. Howard explained:

On Friday, December 9th [of 2011], I, myself, along with Amanda Luallen and then another coworker, Kim Dugger, went out to find the mother, who the child was in the trial home visit with, because I [had received some information that concerned us].

* * *

When we did find [the Child], it was out at the Windy Hills Apartments where [Father] lived. The maternal grandparents also had an apartment there, and the mother was there with the child. We had informed her that we were revoking the child's home visit based on our knowledge that we had of the concerns. At that point, after [Father] became very upset, pretty belligerent, we had called the police, and they were en route on the way to where we were.

At one point, [Father] became belligerent to a point he got in case manager Luallen's face, spit in her face, and at that point, I realized the situation, so I said, "We've got to get [the Child] and get out of here."

[The Child] had been given - - had been handed over to case manager Luallen, and then had become like some tension when we were trying to get him out. [Father] went over, grabbed [the Child] out of case manager Luallen's hand and was screaming and cussing us to the point where I had to intervene and mediate with [Father] to the point to say, you know, "Can you please give [the Child] to us, let's don't do this."

I was able to finally get [the Child] away, hand him off to case manager Dugger, and tell case manager Dugger to get [the Child] and case manager Luallen in my car safely and lock the doors and do not unlock the doors for any reason whatsoever due to his - - our concerns of violent behavior in the past.

We were able to get him in there - - [Father] - - was able to calm him down. And he was like, I'm sorry but I know we just want to take - - we just wanted to take - - told me himself, that, Yes, that we were at the food court arguing. We wanted to take [the Child] to go see Santa Claus, you know, that's very important to us. So we wanted to get a picture with Santa Claus. That's why we met up, even though we weren't supposed to, met up to do that.

So I said, "I understand that's important to you, but you know, you have to follow the rules. Now this is resulting in him going back in a foster home."

And then he said, "Well, I want to apologize to case - - to Amanda and also I have - - he's been sick. I have his medicine in my house and some formula, and I want to make sure it goes with him."

I said, "I understand, thank you." You know, so we were trying to get that, take it to the car, and the window was cracked just a little on Amanda's side and . . . Never did apologize. Start shoving a picture in there, scaring Amanda and [the Child] again. Say, "This is why - - this is what we were trying to do tonight, was just have a picture made with Santa," and acting more belligerent.

So I said, "Okay. That's it, we - - we're leaving." And so at that point, we were able to - - I was able to safely get in the car and leave with him still cussing in the parking lot.

The day before this incident, Father had failed a drug test by testing positive for methamphetamine, opiates, oxycodone, and benzos. Ms. Howard stated that DCS told Father he needed to get help, and he replied "Yeah, I know." Ms. Howard also told Father that the trial home visit would be revoked if Father had any contact with the Child that was unsupervised by DCS during the Child's trial home visit with Mother. Ms. Howard explained:

We were doing separate visitations [for the Child with Mother and with Father], and we were supervising [Father's] contact because of the volatile relationship and the domestic relationship that existed between [Father and Mother]. We tried to do visits together, but it was too volatile even at our DCS office.

Ms. Howard further explained that the day after Father failed the drug test, Father and Mother were together at the mall with the Child. Father, Mother, and the Child left the mall and went to Mother's parent's residence together, which is where they were when the DCS workers found them. Ms. Howard testified that "[a] clerk at the mall - - he told me that, yes, [Father and Mother] were arguing in the food court at the mall when they went to take [the Child] to see Santa." There was an order of protection or a restraining order between Father and Mother, and this order still was in place on the day of the incident at the mall.

Ms. Howard testified about Father's drug use stating:

When I've given [Father] drug screens, especially the one where he tested positive for meth [in December of 2011], when he come [sic] into the office, his clothes were dishevelled [sic], his pants were unzipped, he had the - - like the wild, crazy look in his eye, he was anxious, talking 90 miles per minute, getting all upset, then getting real calm, all upset, then calm. To me, that displays - - . . . - - drug use.

During the four month period immediately after the Child was taken into State custody, Ms. Howard observed Father appearing to be under the influence of substances several times. On those occasions she stated that she observed: "wild, dilated eyes, the explosive behavior up and down, the - - the fidgeting. I've seen that numerous times, whenever I've stepped in for visits or when we're at the home under authority."

Ms. Howard drug tested Father on October 18, 2011, and Father tested positive for benzodiazepine, opiates, and THC. Father again was drug tested on December 8, 2011, and he tested positive for cocaine, benzodiazepine, methamphetamine, and opiates. Ms. Howard was not aware of Father having any clean drug screens during the 25 months that the Child had been in State custody.

Chris Mason, a youth services officer with Roane County Juvenile, testified that he performs some court-ordered drug screens. Mr. Mason testified that he drug screened Father on August 4, 2011, and Father tested positive for benzos and oxycodone.

David Whaley, a juvenile probation officer with DCS, testified that he drug screened Father on November 21, 2011, and Father tested positive for cocaine and oxycodone.

When asked what indicated to her that Father was putting his own interests before those of the Child, Ms. Howard stated: "Continued drug use, the volatile relationship with the mother, by breaking the no-contact order, not addressing his anger management or mental health concerns. Not seeking treatment for his drug abuse or drug use, and his continued arrests."

At the time of trial, the Child had been in foster care for twenty-five months. Ms. Howard testified that during the time the Child has been in foster care, Father has been unable to provide a suitable home.

Ms. Howard was asked about the Child's foster home, and she testified:

[The Child] is thriving in that home, and [the Child's] a very resilient child. He's amazing. He's very smart, very loving, and I have to give credit to the foster parents because they have worked with him from day one. [The Child] has been calling the foster father "dad" since about two weeks in from being there.

He started calling the foster mother "mother" after he came back from the trial home visit, and [the foster parents] actually kept their home open in the - - in the - - in the - - a case [sic] that if [the Child] every come [sic] back into foster care, they wanted to have their home open for him because they consider him a part of their family.

They work with him on numbers. They work with him on - - he is very, extremely smart for his age, very well advanced, and I have to give all the

-6-

credit to the foster parents on this. But [the Child] loves them. They recognize him as their son. He recognizes them as mom and dad. You couldn't ask for a better home for [the Child].

Tonya Blackburn, a family intervention specialist with Foothills Care, testified that she provided therapeutic visitation for the Child. She explained:

Our role is to observe the interaction with the parents and the children, to be able to observe the bond that they have, to be able to take note if the parents are in tune with the child's needs during those visits. We're there to assist parents in working on parenting skills, give redirection, give direction as well, as needed.

Ms. Blackburn began providing therapeutic visitation for the Child and Father in September of 2011. Ms. Blackburn testified she worked with Father and stated:

I worked with him for eight months, and so over the course of that eight months, we definitely worked on parenting skills. We had a lot of dialogue about relationship building, healthy and appropriate communication skills. We touched on the cycle of abuse in families.

I provided some substance abuse education. I was able to work on domestic violence education with the parents and also tried to work on discussing some unresolved trauma from childhood with [Father].

Ms. Blackburn stated that she had some concerns abut Father's behavior. She testified:

There was definitely concerns of him being physically aggressive with [the Child]. For him to be such a small child, the way that he handled him and played with him was - - definitely leaned on the aggressive side.

It was an ongoing thing to where he would hold [the Child] really tight in his arms and the child would be in distress and obviously struggling to want to get down and he would not let him go and wouldn't let him get down even though he was crying and showing that he wanted to get down.

There was concerns, and it was ongoing as well, of him trying to force feed [the Child]. He was observed shoving food in [the Child's] mouth whenever [the Child] was showing that he was not interested in eating at all.

-7-

I also observed him on several occasions taking his hand and smashing [the Child's] cheeks trying to open [the Child's] mouth to make him open his mouth and eat. And then other times, the food issue was concerning because he would bring food for [the Child] and when [the Child] didn't want it after a while with trying to be made to eat it, he would eat all the food and then have to be reminded that even though he doesn't want it now, maybe in an hour-and-a-half, he does and then he's not going to have any food left. And so that was a concern of not always being in tune with [the Child's] needs and what it was that he was wanting and needing at the time.

Ms. Blackburn testified: "Most of the time whenever we had conversation regarding domestic violence, [Father] would defer most things to [Mother] and place blame that whatever had happened was her fault and struggled to accept very little blame for any part he had to play in their domestic violence issues." Ms. Blackburn testified about a phone call she received stating:

I had gotten a phone call one Saturday morning at 5 o'clock in the morning and it was a voicemail message left from that and I could hear an argument between the two of them and I could hear [Father] cursing at [Mother] and I could hear [Mother] repeatedly asking him "Just leave, just leave."

Ms. Blackburn recognized the caller because "[i]t was [Father's] cell phone number that was saved into my phone," and because she recognized the voices. Father also discussed that phone call with Ms. Blackburn during his next visitation.

Ms. Blackburn was asked about times Father behaved erratically, and she stated:

There was an occasion following a visit one day to where he was asked to provide a drug screen, which was part of his permanency plan. That had been explained to the parents and he became very argumentative, cursing, talking about his rights being violated because of having to provide this. He went as far to leave the DCS office upon entering, drove and came back to the office. . . . That was one specific day, but there were several occasions to where I saw him go from being very pleasant to being quite erratic and inconsistent in his behaviors.

Ms. Blackburn testified that there were three specific occasions during the eight month period when she observed this type of behavior. Ms. Blackburn did not feel that she needed

to recommend that visitation between Father and the Child be stopped, but she stated that she would not have recommended unsupervised visitation.

Melinda Edmonds, the Child's DCS caseworker since December of 2011, testified at trial. Ms. Edmonds testified that a total of four permanency plans[2] were created for the Child. The first plan was created in August of 2011 ("the Plan"). Under the Plan Father was to obtain an alcohol and drug assessment and follow all recommendations, complete a mental health assessment and follow all recommendations, enroll in parenting class and demonstrate parenting skills, participate in visitation with the Child, pay child support, and keep a stable home, legal income, and transportation. The completion date for the Plan was set for February of 2012.

Ms. Edmonds testified that Father completed some of the steps required under the Plan. She stated that he had a legal income, he completed parenting classes, he completed the mental health assessment, and was having individual counseling. Ms. Edmonds stated, however, that there were concerns when it later was discovered that Father did not disclose information during his mental health assessment.

Ms. Edmonds testified that a drug screen was done on Father on December 14, 2011, and Father tested positive for cocaine, benzodiazepine and oxycodone. On March 22, 2012, Father tested positive for cocaine and oxycodone. A drug screen done on June 15, 2012, showed that Father tested positive for cocaine, opiates, and oxycodone. On November 21, 2012, Father tested positive for benzodiazepines and oxycodone. A hair follicle test also was done, and Ms. Edmonds testified that Father tested positive for benzoylecgonine, "cocaine, and more cocaine." During the time the Child has been in State custody, Father has had no drug screens that were negative for all substances.

Ms. Edmonds testified about reasonable efforts made by DCS during the first four months the Child was in custody stating:

> We were able to help [Father] with finding appropriate people to do his alcohol and drug assessment testing that he finally completed January the 29th, 2012. We were able to give him referrals to various mental health persons as we were asking for an new [sic] health assessment. We continued with the therapeutic visitation and continued with any referrals for domestic violence.

---

[2]The first three plans were ratified by the court. The requirements for Father under all of the revised plans were substantially the same as those under the plan created in August of 2011.

When Ms. Edmonds was asked what tasks under the Plan Father had failed to complete, she stated:

> He has never followed the recommendations of the alcohol and drug assessment. He has failed to obviously maintain stable housing since he's currently incarcerated. Legal income and transportation is something I can't measure at this point since he is incarcerated. Mental health assessment, you know, the recommendations were that we were to get a new mental health assessment because we had concerns about his - - that he was not disclosing fully and that was not completed.

She also testified that Father never took domestic violence classes, despite the fact that DCS made several referrals through Father's insurance for him to do so. Ms. Edmonds testified that Father's noncompliance with the Plan persisted up to trial.

Ms. Edmonds was asked about conditions in the home that led to the Child's removal and when asked which, if any, of these conditions still persist, she stated: "The drug and alcohol abuse in the home, the domestic violence was off and on through the life of the case that I've had it, and just the general conditions with the drug and alcohol abuse." Additionally Father has been involved in criminal activity throughout the case, and some of Father's convictions were for drug and alcohol related offenses. Father was incarcerated at the time of trial, and Ms. Edmonds was not aware that Father had a home to go to when he got out of jail.

Ms. Edmonds testified that the conditions have not improved in the 25 months that the Child has been in State custody, and she further stated: "they've worsened." Ms. Edmonds did not believe that the conditions will improve within a reasonable amount of time.

Ms. Edmonds was asked if she had observed Father acting as though he were under the influence during a visitation, and she stated:

> November the 21st, 2012, during a supervised visit, [Father] was slurring his words and appeared to be intoxicated. I completed a drug screen on him and he tested positive for marijuana.

> We asked for a random pill count as [Father] appeared to be hiding one of his pill bottles in his pocket. He became angry about that and actually left the visit and then came back at a later point.

-10-

When asked about the Child's relationship with the foster parents Ms. Edmonds stated: "They're very bonded. [The Child's] very bonded with them. He calls them Mom and Dad. He has a little foster sister that he loves, that's his sister. He just has a good, loving, stable relationship with both of them." Ms. Edmonds stated that she believes that it would be "extremely detrimental and traumatic" to the Child to remove him from the foster home. He has been in that foster home for over two years, and it is the only foster home the Child ever has been in.

Amy D., the Child's foster mom ("Foster Mom"), testified that the Child was placed in her home on August 4, 2011 when he was 17 months old. Foster Mom testified that the Child did a trial home visit with Mother around October that lasted for approximately one month. When the trial home visit was disrupted, the Child was returned to Foster Mom's home. Foster Mom testified:

[W]hen [the Child] first came into our home, he was 17 months old and he was - - it was a rough transition I think for him in the beginning. He - - I mean obviously, he was 17 months old and never seen us.

But he is a very charming little boy, always was and we - - he adjusted pretty well after a couple of weeks and we just loved him. He's funny, he's sweet, he's a smart little kid.

He was with us for, like I said, from October 31st, so it was a little over two months and he went back to his birth mom for a trial home visit and that was really hard, but we really thought it was - - we thought it was going to be a good placement. We thought he was going to do well there. We thought that she was ready for that and so it was hard, but, you know, we - - everyone felt like that was the right decision at the time, and we missed him.

And then he came back, and when he came back, he remembered us and we, obviously, were excited to see him again and since that time, obviously, we've gotten closer. He didn't always - - he calls me Mom now. He did not in the beginning. The first time we had him, the first couple of months, he called me Anna. I don't know where he got that, but he called me Anna. And the second time he was placed in our home, within probably about a month or two, he just started calling me Mom. I don't know where - - we never encouraged that, but that's what he called me and that's who I've been ever since. And we love him. He's a sweet kid. He is a part of our family we feel like and we're blessed to have him there.

When the Child first came to the foster parents' home, the household consisted of the foster parents and the Child. Since that time the foster parents had a biological daughter, and Foster Mom testified that the Child "tells everybody, 'This is my sister. I'm going to protect her. I'm going to keep her safe.'" Foster Mom stated: "it's the four of us there and the dog and, you know - - he is our foster son and I understand that, and I understand that he is still not ours, but in our hearts, we love him just as much as if he were."

Foster Mom is a stay-at-home mother. Foster Mom testified that the Child has his own bedroom in the foster home. She also testified that the Child, who was three-and-a-half years old at the time of trial, attends preschool "five days a week from 8:00 to 12:00 and is doing really well there."

Foster Mom believes that it would be detrimental for the Child if he were removed from the foster home. She stated:

> I think that he would have a very hard time if he were to leave at this point. He - - we're the home that he remembers from the time that he was able to remember things. 17 months old is very young and, you know, we are home, we are Mom, we are Dad, we are Nana and Papa, you know, we are all that he knows at this point as far as family.

Matthew D., the Child's foster father ("Foster Dad"), also testified at trial. Foster Dad testified:

> [The Child] has been in our house since August 4th, of 2011. He came in there the day we were approved to be foster parents. At the - - initially, it was to be a fairly temporary - - or our understanding was that it was to be a temporary placement. He went back to, I believe, his mother in October 31st and then he returned to us December 9th or 10th, 2011, and we've had him - - we've had him since.

> My wife and I, we have a daughter named Lily, but she is a year old. We did not have - - so we in my ways [sic] [the Child] has been a first, first son or first child to us. We've experienced a lot of those "firsts" as parents. Maybe not the walking or the first word, but a lot of those experiences that come with being a first-time parent with him.

Foster Dad testified that the Child considers him and his wife to be his parents. Foster Dad also testified that the Child considers the foster parents' daughter to be his sister

and "has from day one." Foster Dad believes that if the Child were removed from the foster home:

> [I]t would be devastating to him. I pause to talk about my own relationship, but certainly seeing him with my wife and just the relationship that the two of them have and then on the relationship that he happens to have with my one-year-old daughter, it's been amazing to see. I haven't - - he has not - - just been amazed by how kind and considerate that he has been towards her and just the relationship that she has back to him. She obviously thinks he's the greatest thing going.

Foster Dad was asked about his hopes for the Child, and he testified:

> [M]y wife and I, we are Christians. We would - - we deeply desire that he would become a christian as well, but that he would live his life in a manner that was honoring to God, but then uplifting to the people around him, that he would - - a career; that he would find something that he enjoyed doing, that he was - - that he could help other people in and that he just desired to do. He's a very - - I haven't seen very many people who are as charismatic and just charming as [the Child] is. He's a very special kid in that way and that's certainly not something that he got from myself, so that's neat to see.

> With that sort of charisma, he could do - - he could be successful at anything and he certainly has a lot of smarts as well. He's a very gifted kid in that sense.

Foster Dad was asked how he would feel if the Child were removed from his home, and he stated:

> [A]s a prosecutor, I'm sworn to uphold the law and I mean it's not my call - - I mean it's to do with the law. . . . I view him as my son and I would feel that the loss of him from my home would be similar to that of a death in the family.

Foster Dad testified that he and his wife want to adopt the Child if the Child becomes available for adoption.

Father testified at trial that:

> all my life I've been a tattoo artist and I've done, you know, drugs and drinking for a lot of years and when [the Child] came into my life, I realized

-13-

I wanted to do something different because doing, you know, being a tattoo artist, you know, the guys love you, the girls love you, and they throw money at you and drugs and it's just a party and I did not want to live like that with this little boy because I knew I had to do something different, and so I got signed up for school. I started attending Tennessee Tech in the diesel mechanic program.

Father testified that he started at Tennessee Tech "[r]ight after [the Child] was born," and stated that he continued there until he was arrested in November of 2012.

Father was questioned about the fact that from the time the Child was removed from his home until he was incarcerated Father continued to test positive for drugs. Father was asked what he had done since the Child was taken into State custody to show an intent to change, and he testified: "I was told to go into a drug program. I couldn't find any place that I could get into, so I turned myself into the Parkwest for the intake . . .," in 2011. Father testified that he stayed there for two or three weeks and then went to Ridgeview for the outpatient program. Father testified: "I continued with Ridgeview and Ridgeview made recommendations that I get into outpatient and I finally ended up going to Hope of East Tennessee, which is in Oak Ridge." Father stated: "I've had a drug problem all my life and I've addressed it. I've been addressing it for years and I've had that problem." Father testified that he went to Ridgeview twice a month for a couple of years. Father testified that when he was arrested in November of 2012 he had been attending Hope of East Tennessee in Oak Ridge and that he went there "[t]wo or three nights a week. . . . It was like two or three nights, three or four nights a week." When asked how long he had been going to Hope of East Tennessee, Father stated: "About three or four weeks." Father stopped going there because he was arrested.

Father admitted that he has tested positive for drugs on multiple occasions. He stated: "I'm an addict. I meant I'm an addict and I've been - - I've done better over these years since I've had my son. I've really been trying to turn my life around with school. I've attempted to do all these programs that DCS had set out for me, you know." Father testified that he was almost 50 years old at the time of trial and that he had been doing drugs since he was a teenager.

Father testified that he has six other children who at the time of trial were adults. Father admitted that during the time the Child has been in State custody that Father tattooed his nickname on a teenage girl who was under the age of 18. Father admitted that he has been indicted in Roane County on drug charges, and further admitted that he was convicted of possession of drug paraphernalia for being in possession of a crack pipe in Knox County during the time that the Child has been in State custody.

-14-

Father denied that every time he was drug tested he tested positive. He stated:

I've heard that today, but that's not true because there were many times that I tested positive and I asked Melinda, as well as Jessica, "Please, I know that's not true." And I went to the hospital immediately and in a short timeframe of time and made them take blood tests and blood tests came back negative.

Father was asked why he did not produce these hospital blood tests and he stated: "I didn't know I was going to be here today." Father then was asked if his testimony was that his attorney failed to tell him that the trial to terminate his parental rights was being held and Father stated: "I did not know that. I didn't even know I had a court date today."

Father was asked if there ever was a period during his adult life when he was not involved in some type of criminal activity and Father stated: "Yes." When asked when, however, Father stated: "I can't - - I can't give you dates right off the top of my head, no - - . . . - - I can't." Father was asked about his testimony that he was going to get his struggles with drug use behind him and when he was going to do so and he stated: "I don't - - I can't predict the future."

After trial the Juvenile Court entered its very detailed order on February 19, 2014 finding and holding, *inter alia*:

For the reasons set forth below, based upon clear and convincing evidence, the Court concludes that the Petition filed by the Department is well taken, should be sustained, and the relief sought be granted. Accordingly, the Court concludes that the parental rights of [Father] to the child should be terminated and that such termination is in the child's best interest.

## II. FINDINGS OF FACT AND CONCLUSIONS OF LAW

**A. Findings of Fact:** As required by Tenn. Code Ann. §36-1-113(k), the Court makes the following findings of fact by clear and convincing evidence based on the testimony of witnesses, the exhibits presented during the trial of this cause, as well as the entire record in this action.

The child entered state custody on August 4, 2011, pursuant to a bench order of custody which found probable cause that the child was dependent and neglected due to drug and alcohol use, criminal activity, and domestic violence in Respondent [Father's] home. The child was adjudicated dependent and

neglected on November 15, 2011, based in part, on a stipulation by [Father] that the child was dependent and neglected in his care due to domestic violence in his home. [The Child] has remained in foster care continuously since August 4, 2011. [The Child's] biological mother surrendered her parental rights on April 19, 2013, and an Order of Partial Guardianship was entered by this Court on July 2, 2013; therefore, the termination of parental rights is non-suited with respect to [Mother].

DCS Case Manager Melinda Edmonds testified that permanency plans were created for the family during [the Child's] time in foster care. The initial permanency plan was created on August 16, 2011. The initial permanency plan required [Father] to: pay child support in the amount of $100 per month; attend domestic violence classes and sign up for said classes, within two weeks of the date of the plan; complete a mental health assessment and follow recommendations; sign a release of information to allow DCS access to the results of the assessments; provide a copy of the certificate demonstrating completion of domestic violence classes; complete an alcohol and drug assessment, within two weeks of the date of the plan; maintain housing, maintain legal employment; and provide a childcare plan for [the Child] when [Father] is working. The Court ratified the plan and adopted the plan as an order of the Court on September 27, 2011, after making the finding that the requirements for [Father] were reasonably related to remedying the child's need for foster care. [Father] signed the permanency plan and received a copy of the Criteria for Termination of Parental Rights, which included an explanation of his duty to comply with the permanency plan.

The child was adjudicated dependent and neglected on November 15, 2011, due in part, to [Father's] stipulation to domestic violence in his home. The permanency plans were revised three times and the initial requirements for [Father] were reiterated. Since that time, [Father] has not: completed domestic violence counseling; completed drug rehabilitation treatment; had any clean drug screens and, alternatively, has continuously tested positive for illicit substances; truthfully submitted to a mental health assessment; maintained stable housing; resolved his legal problems; or refrained from involving himself in new criminal activity.

Instead, during the time that the child was in foster care, [Father]: admitted to using illicit drugs; tested positive for illicit drugs, including cocaine, on multiple occasions; remained under indictment for drug related charges; and was convicted of, and admits to possessing a crack cocaine pipe

in Knox County, Tennessee, in November of 2012. [Father] was incarcerated on multiple occasions while his child was in foster care including a period of time beginning in or about January 2013, persisting to the time of this termination of parental rights proceeding on September 26, 2013.

DCS provided reasonable efforts to assist [Father] in providing a suitable home at an early date and to comply with his responsibilities under the permanency plan. DCS provided resources for [Father] to obtain an alcohol and drug assessment, mental health assessment, and domestic violence classes. DCS offered payment for these services in the event that said services were not covered by [Father's] insurance plan. DCS also provided [Father] with a hair follicle drug test and random urine drug screens at no cost to [Father]. DCS provided therapeutic visitation services through Foothills Care and developed a plan for reunification with [Father]. DCS provided daily care and support of the child, ongoing case management, medical and dental care for the child, and ongoing advice and recommendations to [Father].

[Father] submitted to urine drug screens which were all positive for illicit substances, on: August 4, 2011, positive for benzodiazepine and oxycodone; October 18, 2011, positive for benzodiazepine, opiates and THC; November 21, 2011, positive for cocaine and oxycodone; December 8, 2011, positive for cocaine, benzodiazepine, methamphetamine, and oxycodone; December 14, 2011, positive for cocaine, benzodiazepine, and oxycodone; March 22, 2012, positive for cocaine and oxycodone; June 15, 2012, positive for cocaine, opiates, and oxycodone; and on November 21, 2012, positive for benzodiazepine and oxycodone. [Father] was positive on his hair follicle drug test for cocaine among other illicit substances.

[Father], a convicted felon, continued to engage in criminal activity during the time the child was in foster care. In addition to persistent illicit drug use, which [Father] admitted at hearing on September 26, 2013, [Father] also admitted that he was in possession of a glass crack pipe in Knox County, Tennessee, in November 2012. [Father] was subsequently convicted of possession of drug paraphernalia for his actions in November 2012. The Court received evidence of [Father's] criminal history, including previous drug related convictions, which further demonstrate that substance abuse has persisted in [Father's] home for an extended period of time. [Father] admits at hearing on September 26, 2013, that he has struggled with substance abuse, for the last thirty to thirty-five years. [Father] states that he will change and intends to address his substance abuse problems; however, when asked for an

estimated timeframe in which he intended to change, [Father] could not give a definite answer.

The Court received evidence from [the Child's] resource parents, [Foster Dad and Foster Mom], who testified that they intended to provide [the Child] a permanent home with their family should he be freed for adoption. [Foster Mom] testified that [the Child] considers her and her husband to be his parents and that he has lived with them since he was approximately seventeen months old. [Foster Mom] testified that [the Child] has an infant sister, who is a biological child of [Foster Dad and Foster Mom], who [the Child] believes is his own sibling. [Foster Dad] testified that he wants [the Child] to grow up to be a successful person who has a career that he loves and to be a person who helps other people. The Court received photographs into evidence which depict [the Child's] life in his resource home, including birthday parties, family outings and candid moments with his resource family.

DCS Team Leader Jessica Howard testified regarding [Father's] aggressive and seemingly intoxicated behavior, including a time when he appeared agitated and intoxicated in the DCS office and another incident where he spit in the face of his DCS foster care case manager, Amanda Luallen. DCS Foster Care Case Manager Melinda Edmonds testified regarding the extensive reasonable efforts provided by DCS, the lack of progress gained by [Father] under the permanency plan, and the persistent conditions in [Father's] home. Both Team Leader Howard and Case Manager Edmonds testified that [the Child] deserved a safe and permanent home and that, in all reasonable probability, it did not appear that [the Child] would ever achieve permanency if [Father] retained his parental rights.

**B. Conclusions of Law:** Under Tennessee law, termination of parental rights must be based on a finding by the court by clear and convincing evidence that (1) the grounds for termination of parental rights have been established; and (2) termination of the parent's or guardian's rights is in the best interest of the child. Tenn. Code Ann. §36-1-113(c).

Here, the Court concludes that there is clear and convincing evidence to support grounds for termination of [Father's] parental rights under Tenn. Code Ann.§36- 1-113(g). In addition, the Court concludes, based on clear and convincing evidence that termination of [Father's] parental rights is in the child's best interest. Each ground is discussed in turn.

## 1. Abandonment - Failure to Provide a Suitable Home
## Tenn. Code Ann. §§ 36-1-113(g)(1) and 36-l-102(1)(A)(ii)

In this case, pursuant to Tenn. Code Ann. §§36-1-113(g)(1) and 36-1-102(l)(A)(ii), the Court finds that there is clear and convincing evidence that [Father] failed to provide a suitable home for the child, despite extensive reasonable efforts by DCS.

The child was removed from [Father's] home on August 4, 2011, due [to] drug and alcohol use, criminal activity and domestic violence perpetrated by the parents. The child was subsequently adjudicated dependent and neglected on November 15, 2011, due in part to [Father's] stipulation that there was domestic violence in the home. The Court found on August 9, 2011, that based on the child's circumstances at the time of removal reasonable efforts were not required.

DCS Team Leader Jessica Howard testified that during the first four months the child was in DCS custody, from August 4, 2011, to December 4, 2011, DCS made reasonable efforts to assist [Father] in providing a suitable home for the child. DCS provided resources for [Father] to obtain an alcohol and drug assessment, mental health assessment, and domestic violence classes. DCS offered payment for these services in the event that said services were not covered by [Father's] insurance plan. DCS provided [Father] random urine drug screens at no cost to [Father]. DCS provided therapeutic visitation services through Foothills Care and developed a plan for reunification with [Father]. DCS provided daily care and support of the child, ongoing case management, medical and dental care for the child, and ongoing advice and recommendations to [Father].

[Father] failed to provide a suitable home for the child in the first four months the child was in state custody. [Father] submitted to urine drug screens which were all positive for illicit substances, on: August 4, 2011, positive for benzodiazepine and oxycodone; October 18, 2011, positive for benzodiazepine, opiates and THC; and on November 21, 2011, positive for cocaine and oxycodone. [Father] completed a mental health assessment, however, he was not truthful in that assessment about his past mental health diagnoses, and he failed to comply with recommended treatment. [Father] failed to successfully complete domestic violence classes. [Father] failed to successfully complete substance abuse rehabilitation treatment, and persisted in his use of illicit substances. [Father] was observed by DCS personnel to

-19-

violate the no contact order entered as part of an order of protection, on multiple occasions. [Father] was arrested during the first four months the child was in state custody due to contributing to the delinquency of a minor and for domestic assault. During therapeutic visitation sessions, [Father] displayed inappropriate parenting including multiple instances of him force feeding the child. During the first four months the child was in DCS custody, [Father] repeatedly violated the court ordered supervised visitation and visited the child unsupervised with the mother.

## 2. Substantial Noncompliance with Permanency Plan
## Tenn. Code Ann. §§ 36-1-113(g)(2) and 37-2-403(a)(2)

In this case, pursuant to Tenn. Code Ann. §§ 36-1-113(g)(2) and 37-2-403(a)(2), the Court finds that there is clear and convincing evidence that [Father] failed to substantially comply with his requirements under the permanency plan despite reasonable efforts by DCS to assist him in completing those requirements.

After [the Child] entered foster care, DCS created permanency plans for him. The initial permanency plan required [Father] to: pay child support in the amount of $100 per month; attend domestic violence classes and sign up for said classes, within two weeks of the date of the plan; complete a mental health assessment and follow recommendations; sign a release of information to allow DCS access to the results of the assessments; provide a copy of the certificate demonstrating completion of domestic violence classes; complete an alcohol and drug assessment, within two weeks of the date of the plan; maintain housing, maintain legal employment; and provide a childcare plan for [the Child] when [Father] is working.

The Court ratified the plan and adopted the plan as an order of the Court on September 27, 2011, after making the finding that the requirements for [Father] were reasonably related to remedying the child's need for foster care. [Father] signed the permanency plan and received a copy of the Criteria for Termination of Parental Rights, which included an explanation of his duty to comply with the permanency plan. The permanency plans were revised three times and the initial requirements for [Father] were reiterated.

Since that time, [Father] has not: completed domestic violence counseling, completed drug rehabilitation treatment, had any clean drug screens and has continuously tested positive for illicit substances, truthfully

submitted to a mental health assessment, maintained stable housing, resolved his legal problems, or refrained from involving himself in new criminal activity. Instead, [Father]: admitted to using illicit drugs; tested positive for illicit drugs, including cocaine, on multiple occasions; remained under indictment for drug related charges; and was convicted of, and admits to possessing a crack cocaine pipe in Knox County, Tennessee, in November of 2012. [Father] was incarcerated on multiple occasions while his child was in foster care including a period of time beginning in or about January 2013, persisting to the time of this termination of parental rights proceeding on September 26, 2013.

DCS provided reasonable efforts to assist [Father] in complying with his responsibilities under the permanency plan. DCS provided resources for [Father] to obtain an alcohol and drug assessment, mental health assessment, and domestic violence classes. DCS offered payment for these services in the event that said services were not covered by [Father's] insurance plan. DCS also provided [Father] with a hair follicle drug test and random urine drug screens at no cost to [Father]. DCS provided therapeutic visitation services through Foothills Care and developed a plan for reunification with [Father]. DCS provided daily care and support of the child, ongoing case management, medical and dental care for the child, and ongoing advice and recommendations to [Father].

[Father] submitted to urine drug screens which were all positive for illicit substances, on: August 4, 2011, positive for benzodiazepine and oxycodone; October 18, 2011, positive for benzodiazepine, opiates and THC; November 21, 2011, positive for cocaine and oxycodone; December 8, 2011, positive for cocaine, benzodiazepine, methamphetamine, and oxycodone; December 14, 2011, positive for cocaine, benzodiazepine, and oxycodone; March 22, 2012, positive for cocaine and oxycodone; June 15, 2012, positive for cocaine, opiates, and oxycodone; and on November 21, 2012, positive for benzodiazepine and oxycodone. [Father] was positive on his hair follicle drug test for cocaine among other illicit substances.

[Father], a convicted felon, continued to engage in criminal activity during the time the child was in foster care. In addition to persistent illicit drug use, which [Father] admitted at hearing on September 26, 2013, [Father] also admitted that he was in possession of a glass crack pipe in Knox County, Tennessee, in November 2012. [Father] was subsequently convicted of possession of drug paraphernalia for his actions in November 2012.

### 3. Persistent Conditions
### Tenn. Code Ann. §§ 36-1-113(g)(3)

In this case, pursuant to Tenn. Code Ann. § 36-1-113(g)(3), the Court finds that there is clear and convincing evidence that the conditions which led to the child's removal from [Father's] home still persist, and there are other conditions in [Father's] home which, in all reasonable probability, would cause the child to be subjected to further abuse or neglect and prevent the child's safe return to [Father's] care.

The child entered state custody on August 4, 2011, pursuant to a bench order of custody which found probable cause that the child was dependent and neglected due to drug and alcohol use, criminal activity and domestic violence in [Father's] home. The child was adjudicated dependent and neglected on November 15, 2011, based, in part, on a stipulation by [Father] that the child was dependent and neglected in his care due to domestic violence in the home. [The Child] has remained in foster care continuously since August 4, 2011.

Since the child entered state custody, DCS has provided reasonable efforts to assist [Father] in remedying the conditions which necessitated foster care. DCS provided resources for [Father] to obtain an alcohol and drug assessment, mental health assessment, and domestic violence classes. DCS offered payment for these services in the event that said services were not covered by [Father's] insurance plan. DCS also provided [Father] with a hair follicle drug test and random urine drug screens at no cost to [Father]. DCS provided therapeutic visitation services through Foothills Care and developed a plan for reunification with [Father]. DCS provided daily care and support of the child, ongoing case management, medical and dental care for the child, and ongoing advice and recommendations to [Father].

The reasonable efforts by DCS far outweighed [Father's] efforts to change his personal circumstances. During the twenty-five months that this child was in state custody, [Father] did not: complete domestic violence counseling or drug rehabilitation treatment. [Father] did not even have any clean drug screens and instead has continuously tested positive for illicit substances. [Father] did not truthfully submit to a mental health assessment, nor has he maintained stable housing, resolved his legal problems, or refrained from involving himself in new criminal activity. Instead of improving his personal condition, [Father] continued to use illicit drugs; tested positive for

-22-

illicit drugs, including cocaine, on multiple occasions; and remained under indictment for drug related charges.

[Father] submitted to urine drug screens which were all positive for illicit substances, on: August 4, 2011, positive for benzodiazepine and oxycodone; October 18, 2011, positive for benzodiazepine, opiates and THC; November 21, 2011, positive for cocaine and oxycodone; December 8, 2011, positive for cocaine, benzodiazepine, methamphetamine, and oxycodone; December 14, 2011, positive for cocaine, benzodiazepine, and oxycodone; March 22, 2012, positive for cocaine and oxycodone; June 15, 2012, positive for cocaine, opiates, and oxycodone; and on November 21, 2012, positive for benzodiazepine and oxycodone. [Father] was positive on his hair follicle drug test for cocaine among other illicit substances.

Other conditions exist in [Father's] home that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect and prevent the child's safe return to the [Father's] care. [Father] was incarcerated on multiple occasions while his child was in foster care including a period of time beginning in or about January 2013, persisting to the time of this termination of parental rights proceeding on September 26, 2013. [Father], a convicted felon, continued to engage in criminal activity during the time the child was in foster care. In addition to persistent illicit drug use, which [Father] admitted at hearing on September 26, 2013, [Father] also admitted that he was in possession of a glass crack pipe in Knox County, Tennessee, in November 2012. [Father] was subsequently convicted of possession of drug paraphernalia for his actions in November 2012.

### 4. Best Interest

Under Tenn. Code Ann. §36-1-113(i)(1) [sic], the Court is required to find that termination of parental rights is in the child's best interest.

In this case, the Court finds that there is clear and convincing evidence that termination of [Father's] parental rights is in the best interest of the child in that [Father] has not made changes in his conduct or circumstances that would make it safe for the child to go home. [Father] continues to engage in substance abuse as evidenced by his own testimony and his continued positive drug screens. [Father] also continued to participate in criminal activity as evidenced by his continued positive drug screens, admission to illicit drug use, and conviction for possession of drug paraphernalia; [Father] was incarcerated

at the time of trial due to these illicit activities and pending indictments for drug sales.

[Father] has failed to effectuate lasting change in his conduct and circumstances, despite reasonable efforts by DCS, for such an extended period of time that it does not appear that lasting change is possible. Despite reasonable efforts made by DCS for the last twenty-five months, like: providing resources for [Father] to obtain an alcohol and drug assessment, mental health assessment, and domestic violence classes; offering payment for these services in the event that said services were not covered by [Father's] insurance plan; providing [Father] with a hair follicle drug test and random urine drug screens at no cost to [Father]; providing therapeutic visitation services through Foothills Care; developing a plan for reunification with [Father]; providing daily care and support of the child, ongoing case management, medical and dental care for the child, and ongoing advice and recommendations to [Father]; [Father] has continued to engage in illicit drug use, criminal activity, and has failed to effectuate lasting change to remedy the conditions which placed this child in foster care.

There is no meaningful relationship between the child and [Father] at this point. [Father] has been incarcerated for an extended period of the child's short life due to [Father's] choice to engage in criminal activity. Additionally, the child has not been in the care of [Father] for the last twenty-five months of the child's forty-two months of life.

It is in the child's best interest that [Father's] parental rights be terminated, because he abuses drugs which renders him consistently unable to provide safe and stable care for the child. [Father] has not completed a substance abuse treatment program and as recently as November of 2012, was in possession of drug paraphernalia; [Father] admitted at trial on September 26, 2013, that he hasn't really had a chance since November of 2012 to commit a crime as he has been incarcerated for the majority of that time. During the twenty-five months the child has been in state custody, [Father] has not had even one clean drug screen.

[Father's] mental and emotional state is detrimental to the child and prevents him from effectively parenting the child. [Father] stated that he has been diagnosed with and suffered from bi-polar and schizoaffective disorder, however, he refused to truthfully submit to a mental health assessment despite efforts by DCS to provide an assessment to him.

Changing caregivers [sic] at this time in the child's life will have a detrimental impact on him. The resource parents and Case Manager Edmonds testified that the child has been placed with resource parents [Foster Dad and Foster Mom] for the past twenty-five months, absent a few weeks that he spent on a trial home visit with his biological mother. [Foster Mom] testified that while the child understands that he has biological parents, that he considers [Foster Dad and Foster Mom] to be his true parents. The child entered the care of [Foster Dad and Foster Mom] when he was merely seventeen months old, and has remained there ever since. [Foster Mom] testified that the impact on [the Child] if he were removed from their home would be devastating and that he would not understand leaving his family. Testimony established that [the Child] has a strong bond with his resource family; both [Foster Dad and Foster Mom] testified that they intend to adopt [the Child] and make him a permanent part of their family.

**IT IS, THEREFORE, ORDERED, ADJUDGED AND DECREED:**

That all of the parental rights of [Father] to [the Child], be and the same are hereby forever terminated; . . . .

Father appeals the termination of his parental rights to the Child to this Court.

**Discussion**

Although not stated exactly as such, Father raises four issues on appeal: 1) whether the Juvenile Court erred in finding that clear and convincing evidence existed to terminate Father's parental rights to the Child for abandonment by failure to provide a suitable home pursuant to Tenn. Code Ann. § 36-1-113(g)(1) and § 36-1-102(1)(A)(ii); 2) whether the Juvenile Court erred in finding that clear and convincing evidence existed to terminate Father's parental rights to the Child for substantial noncompliance with the permanency plan pursuant to Tenn. Code Ann. § 36-1-113(g)(2); 3) whether the Juvenile Court erred in finding that clear and convincing evidence existed to terminate Father's parental rights to the Child for persistent conditions pursuant to Tenn. Code Ann. § 36-1-113(g)(3); and, 4) whether the Juvenile Court erred in finding that clear and convincing evidence existed that it was in the Child's best interest for Father's parental rights to be terminated.

Our Supreme Court reiterated the standard of review for cases involving termination of parental rights stating:

This Court must review findings of fact made by the trial court *de novo* upon the record "accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise." Tenn. R. App. P. 13(d). To terminate parental rights, a trial court must determine by clear and convincing evidence not only the existence of at least one of the statutory grounds for termination but also that termination is in the child's best interest. *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002) (citing Tenn. Code Ann. § 36-1-113(c)). Upon reviewing a termination of parental rights, this Court's duty, then, is to determine whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence.

*In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006).

In *Department of Children's Services v. D.G.S.L.*, this Court discussed the relevant burden of proof in cases involving termination of parental rights stating:

It is well established that "parents have a fundamental right to the care, custody, and control of their children." *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988) (citing *Stanley v. Illinois*, 405 U.S. 645, 92 S. Ct. 1208, 31 L. Ed. 2d 551 (1972)). "However, this right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute." *Id.* (citing *Santosky v. Kramer*, 455 U.S. 745, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982)).

Termination of parental or guardianship rights must be based upon a finding by the court that: (1) the grounds for termination of parental or guardianship rights have been established by clear and convincing evidence; and (2) termination of the parent's or guardian's rights is in the best interests of the child. Tenn. Code Ann. § 36-1-113(c). Before a parent's rights can be terminated, it must be shown that the parent is unfit or substantial harm to the child will result if parental rights are not terminated. *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999); *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). Similarly, before the court may inquire as to whether termination of parental rights is in the best interests of the child, the court must first determine that the grounds for termination have been established by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c).

*Dep't of Children's Servs. v. D.G.S.L.*, No. E2001-00742-COA-R3-JV, 2001 Tenn. App. LEXIS 941, at **16-17 (Tenn. Ct. App. Dec. 28, 2001), *no appl. perm. appeal filed*. Clear

and convincing evidence supporting any single ground will justify a termination order. *E.g.,* *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

We first address whether the Juvenile Court erred in finding that clear and convincing evidence existed to terminate Father's parental rights to the Child for abandonment by failure to provide a suitable home pursuant to Tenn. Code Ann. § 36-1-113(g)(1) and § 36-1-102(1)(A)(ii).

As pertinent, Tenn. Code Ann. § 36-1-113(g)(1) provides:

(g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g).  The following grounds are cumulative and non-exclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:

(1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred;

Tenn. Code Ann. § 36-1-113(g)(1) (Supp. 2013).  In pertinent part, Tenn. Code Ann. § 36-1-102 provides:

(1)(A) For purposes of terminating the parental or guardian rights of parent(s) or guardian(s) of a child to that child in order to make that child available for adoption, "abandonment" means that:

\* \* \*

(ii) The child has been removed from the home of the parent(s) or guardian(s) as the result of a petition filed in the juvenile court in which the child was found to be a dependent and neglected child, as defined in § 37-1-102, and the child was placed in the custody of the department or a licensed child-placing agency, that the juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and for a period of four (4) months following the removal, the department or agency has made reasonable efforts to assist the parents(s) or guardian(s) to establish a suitable home for the child, but that the parent(s) or guardian(s) have made no reasonable efforts to provide a suitable home and have demonstrated a lack of

-27-

concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date. The efforts of the department or agency to assist a parent or guardian in establishing a suitable home for the child may be found to be reasonable if such efforts exceed the efforts of the parent or guardian toward the same goal, when the parent or guardian is aware that the child is in the custody of the department;

Tenn. Code Ann. § 36-1-102(1)(A)(ii) (2010).

Without reiterating the Juvenile Court's detailed findings as quoted above, we note that the Juvenile Court found by clear and convincing evidence that, among other things, the Child was found to be dependent and neglected, that DCS made reasonable efforts to assist Father, and that Father continued to test positive for drugs and engage in criminal behavior despite the reasonable efforts made by DCS to assist Father. The Juvenile Court also found by clear and convincing evidence that Father was not truthful during his mental health assessment, that Father failed to comply with the recommended mental health treatment, that Father failed to complete domestic violence classes, and that on multiple occasions Father violated the no contact order entered as part of an order of protection by having contact with Mother. The Juvenile Court found that clear and convincing evidence existed that Father had demonstrated a lack of concern for the Child to such a degree that it appears unlikely that Father will be able to provide a suitable home for the Child at an early date. The evidence in the record on appeal, as discussed more fully above, does not preponderate against these findings made by the Juvenile Court by clear and convincing evidence. We find no error in the Juvenile Court's finding that grounds were proven by clear and convincing evidence to terminate Father's parental rights to the Child for abandonment by failure to provide a suitable home pursuant to Tenn. Code Ann. § 36-1-113(g)(1) and § 36-1-102(1)(A)(ii).

We next consider whether the Juvenile Court erred in finding that clear and convincing evidence existed to terminate Father's parental rights to the Child for substantial noncompliance with the permanency plan pursuant to Tenn. Code Ann. § 36-1-113(g)(2). In pertinent part, Tenn. Code Ann. § 36-1-113(g)(2) provides that grounds for termination of parental or guardianship rights may be based upon:

(2) There has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan pursuant to the provisions of title 37, chapter 2, part 4;

Tenn. Code Ann. § 36-1-113(g)(2) (Supp. 2013).

The Juvenile Court found that clear and convincing evidence existed that the requirements for Father under the Plan were reasonably related to remedying the Child's need for foster care, and that DCS made reasonable efforts to assist Father to comply with his responsibilities under the Plan. The Juvenile Court also found that clear and convincing evidence existed that, among other things:

> [Father] has not: completed domestic violence counseling, completed drug rehabilitation treatment, had any clean drug screens and has continuously tested positive for illicit substances, truthfully submitted to a mental health assessment, maintained stable housing, resolved his legal problems, or refrained from involving himself in new criminal activity. Instead, [Father]: admitted to using illicit drugs; tested positive for illicit drugs, including cocaine, on multiple occasions; remained under indictment for drug related charges; and was convicted of, and admits to possessing a crack cocaine pipe in Knox County, Tennessee, in November of 2012. [Father] was incarcerated on multiple occasions while his child was in foster care including a period of time beginning in or about January 2013, persisting to the time of this termination of parental rights proceeding on September 26, 2013.

The Juvenile Court made specific and detailed findings by clear and convincing evidence that Father had repeatedly failed drug screens and had continued to engage in criminal activity during the time that the Child was in State custody. The evidence in the record on appeal, as discussed more fully above, does not preponderate against these findings made by the Juvenile Court by clear and convincing evidence. We find no error in the Juvenile Court's finding that grounds were proven by clear and convincing evidence to terminate Father's parental rights to the Child for substantial noncompliance with the permanency plan pursuant to Tenn. Code Ann. § 36-1-113(g)(2).

Next, we consider whether the Juvenile Court erred in finding that clear and convincing evidence existed to terminate Father's parental rights to the Child for persistent conditions pursuant to Tenn. Code Ann. § 36-1-113(g)(3). As pertinent, Tenn. Code Ann. § 36-1-113(g)(3) provides:

> (3) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:

> (A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;

(B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and

(C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home;

Tenn. Code Ann. § 36-1-113(g) (Supp. 2013).

We need not reiterate the Juvenile Court's detailed and specific findings made by clear and convincing evidence relative to this ground, as quoted fully above. In short, the Juvenile Court found by clear and convincing evidence that the conditions which led to the Child's removal from Father's home still persist and that there are other conditions which in all reasonable probability would cause the Child to be subjected to further abuse or neglect and which prevent the Child's safe return to Father's care. The evidence in the record on appeal does not preponderate against these findings made by the Juvenile Court by clear and convincing evidence. We find no error in the Juvenile Court's finding that grounds were proven by clear and convincing evidence to terminate Father's parental rights to the Child for persistent conditions pursuant to Tenn. Code Ann. § 36-1-113(g)(3).

Finally, we consider whether the Juvenile Court erred in finding that clear and convincing evidence existed that it was in the Child's best interest for Father's parental rights to be terminated. When making a determination of whether terminating parental or guardianship rights is in the best interest of a child, a court is to consider the list of non-exclusive factors contained in Tenn. Code Ann. § 36-1-113(i).

The Juvenile Court considered all of the relevant factors including those listed in Tenn. Code Ann. § 36-1-113(i) and found that clear and convincing evidence existed that the termination of Father's parental rights was in the best interest of the Child. We need not reiterate the Juvenile Court's findings relative to this issue as they are quoted fully above. The evidence in the record on appeal does not preponderate against these findings made by the Juvenile Court by clear and convincing evidence. We find no error in the Juvenile Court's determination that terminating Father's parental rights was in the best interest of the Child.

The Juvenile Court found that grounds to terminate Father's parental rights had been proven by clear and convincing evidence and that it also had been proven by clear and convincing evidence that the termination was in the Child's best interest. The evidence in the record on appeal does not preponderate against these findings made by the Juvenile Court

-30-

by clear and convincing evidence. We, therefore, affirm the Juvenile Court's February 19, 2014 order terminating Father's parental rights to the Child.

## **Conclusion**

The judgment of the Juvenile Court is affirmed, and this cause is remanded to the Juvenile Court for collection of the costs below. The costs on appeal are assessed against the appellant, William L.W.

_____
D. MICHAEL SWINEY, JUDGE